Lucinda Vining v. Margaret Ramage, Appellant.—3 S. W. (2d) 712.

Division One, March 3, 1928.

*E. W. Nelson, Harry Carstarphen* and *Frank Hendrix* for appellant.

*E. L. Alford* and *Benton B. Megown* for respondent.

SEDDON, C.—Plaintiff alleges in her petition herein that she is the owner in fee simple of certain real estate, described as all of the west one-half each of lots 82 and 87, in block 23, of the city of New London, Ralls County, Missouri, and that, as such owner, she is in full and complete possession of said real estate; that defendant claims to have acquired some right, title, interest or estate, adverse to plaintiff, in and to said real property; wherefore, plaintiff prays the court to ascertain and determine the estate, title and interest of the parties, plaintiff and defendant, respectively, in and to said real estate, and that the court, by its judgment, define and adjudge the title and interest of the parties in and to said real estate; and that the court will grant such other and proper relief, legal or equitable, to which plaintiff may be entitled.

Defendant filed answer, admitting that plaintiff is in possession of the real estate described in the petition and that defendant claims to have acquired, and has acquired, an interest in said real estate, and alleging that defendant's interest is that of owner of said land in fee simple, subject to the life estate of plaintiff therein. The answer, by way of cross-petition, alleges that, on the seventh day of February, 1922, for a valuable consideration, an agreement was entered into between plaintiff and defendant, whereby plaintiff sold to defendant, and defendant purchased from plaintiff, the land described in the petition; that, on said day, plaintiff and defendant sought the services of a scrivener to draft a warranty deed conveying said property, and that said scrivener acted for, and under the di-

rection of, both plaintiff and defendant; that, on said day, plaintiff executed and delivered to defendant a deed purporting to convey said land to defendant, but that, because of mutual mistake of the parties, said deed did not correctly describe said land; that said deed of conveyance was incorrectly written because of the mistake of the scrivener, who drew the deed at the direction and solicitation of both parties to the deed, and that such deed did not express the mutual intent of the parties, but was executed and delivered by plaintiff, and was received by defendant, under a mutual mistake of fact as to the description of the land; wherefore, defendant prays for a reformation of said deed, and of the description of the land conveyed thereby, so as to conform to the true intention of the parties, and that defendant be adjudged to be the absolute owner in fee simple of the land intended to be conveyed, subject to the life estate of plaintiff therein, and for all proper and equitable relief in the premises.

The reply denies that defendant had acquired any right, title or interest in the land described in the petition; denies that plaintiff and defendant at any time entered into any agreement, whereby plaintiff sold to defendant the land described in the petition; denies that plaintiff and defendant sought the services of a scrivener to draft a deed conveying said property, and that said scrivener acted under the direction of plaintiff; denies that plaintiff, on the 7th day of February, 1922, or at any other time, executed and delivered to defendant a deed conveying any land in the city of New London, or elsewhere; denies that any such deed was made for a valuable consideration, and that defendant at any time paid or rendered to plaintiff any consideration for the execution of any deed, and particularly the deed referred to in defendant's answer; alleges that the deed set out in defendant's answer is not the act and deed of plaintiff, and denies that any mistake was made by plaintiff in the description of the land incorporated in said deed, and that the land description therein was inserted by mutual mistake of plaintiff and defendant; alleges that, if any such deed were signed and acknowledged by plaintiff, the same was done when plaintiff was critically ill, and while she was unconscious, irrational and entirely oblivious of her surroundings, and while she was under the influence of opiates administered by her attending physician, and while she was mentally incapable and incompetent of transacting any business, and of executing a deed, or of selling and transferring her property; that plaintiff did not execute of her own volition any deed whatever, or transact any business during said period of her illness; that said deed, if any were executed and delivered by plaintiff, was procured by trickery, artifice and fraud practiced by defendant on plaintiff while plaintiff was in a weakened, irrational and mentally incompetent condition, and therefore such deed was not the act and deed of plaintiff. The reply prays

general relief; that defendant be adjudged and decreed to have no title, right or interest in the real estate described in the petition and in the personal property described in said purported deed; and that all of said property, real and personal, be adjudged to be the absolute property of plaintiff, and that the purported deed from plaintiff to defendant, dated February 7, 1922, be canceled and annulled by the judgment and decree of the court.

The deed which is referred to and pleaded in the answer was put in evidence by defendant. The deed is dated February 7, 1922, and purports to have been executed and acknowledged by plaintiff, Lucinda Vining, as grantor, upon the same date, and was filed for record in the office of the Recorder of Deeds of Ralls County at 10:55 o'clock, A. M., of the same day. It purports to convey to defendant, Margaret Ramage, as grantee, all of lots 174 and 211, block 36, in the city of New London, Ralls County, Missouri, together with "all the household goods and everything contained in the house." The deed recites a consideration "of one dollar and services rendered," and contains the following recital: "This deed is made because the second party has rendered services for me in sickness for the past forty years and the party of the first part has been dependent upon the party of the second part as if she were a daughter. She is to take immediate possession of this property upon my death and I am to occupy and use the property until that time." The purported deed contains the statutory words of warranty, together with special covenants that Lucinda Vining is seized of an indefeasible estate in fee in the premises therein conveyed, and will warrant and defend title to the premises against the lawful claims of all persons. It appears to be conceded by the parties that plaintiff was never, at any time, the owner of the real estate set out and described in said deed, but that plaintiff is the owner of, and occupies as her place of residence, and had owned and so occupied the same for many years prior to the date of said deed, the real estate described as the west one-half each of lots 82 and 87, in block 23, of the city of New London, the same being the west one-half of the east one-half of said block 23. The real property actually owned and occupied by plaintiff is located one city block north of, and distant from, the land described in the said deed.

The evidence herein discloses that plaintiff, Lucinda Vining, is a widow, her husband having died some years prior to the year 1922. She lived alone, after the death of her husband, in a small house upon the land in controversy. Although the record does not show plaintiff's age, we assume, from the general trend of the testimony, that she is an aged and elderly woman. The evidence tends to show that, one or two days prior to February 7, 1922, the date of the purported deed in question, plaintiff became seriously ill. Her attending physician, one Dr. Hendrix, diagnosed her illness as being pneumonia.

Dr. Hendrix testified that he was first called to attend plaintiff on February 5, 1922, and that he continued daily, and several times daily, to visit plaintiff in a professional capacity until on or about February 28, 1922. Dr. Hendrix testified: ''She had pneumonia on February 5, 1922. . . . First visited her on February 5, 1922, for that illness; I found her temperature to be 105. A temperature of 105 is a serious condition of pneumonia; and she was delirious at times. She was delirious when I first visited her on February 5, 1922; I saw her twice on the 5th; also on the 6th, and kept it up for about fifteen or sixteen days. Her condition was very serious on the 5th. She had considerable fever, and did not know anything, and in the morning and evening it went back to 104 and 105. Then she had a condition of the bowels; she had to take medicine to check them. During the ten days following February 5th, she had fever ranging from 102 to 105. Her condition of mind was not good; she would mutter and talk to herself and not seem to know anybody. She was delirious. She had a diarrhoea, and I gave her a half grain of opium every four hours for six or seven days, except at night. I began giving this medicine on the 6th, the next day after I got there; continued to give it. Opium was to quiet the fever and quiet the nervousness; would make her sleepy, and in a comatose condition most of the time; that is, sleepy. This continued from the 6th to the 15th. She was not in a sound condition of mind on February 7th. That day her mind was not sound—not good that day—she was under the influence of opium; could not understand a business transaction. This was true of the 6th and 7th, and up to the 15th. . . . My opinion as physician takes into consideration the pathological condition (caused) by the administration of opium. She could not have understood what an instrument of writing was, nor could they explain it to her so she would understand. I came into the house just as they were getting ready to sign the deed. Mrs. Vining (plaintiff) was lying on the cot, Mrs. Ramage (defendant) went back behind her and propped her up and her hand was over Mrs. Vining's shoulder. She (plaintiff) signed it with her head over on Mrs. Ramage's shoulder; she was doped with opium and could not hold her head up; she was narcotized. . . . With all that opiate, Mrs. Vining could not comprehend the nature of the instrument she was signing.'' THE COURT: ''Now, Dr. Hendrix, you may tell the court in your own way, as a physician, what was Mrs. Vining's mental condition on the 7th day of February, 1922, in soundness of mind and capacity to understand on that day? A. Well, it was not sound on that day—her mind was not sound—it was not good that day—she was under the influence of opium. Q. To what extent could she understand or grasp any business transaction, or other matter? A. Well, she could not do it. Q. She could not do it? A. She could not

do it, no sir. Q. You say that condition obtained on February 7th? A. Yes. It went up till the 15th. . . . Q. Doctor, at the time that this deed was signed, that you saw signed, you may tell the court, in your judgment as a physician, and from your observation as such physician of Mrs. Vining's mental and physical condition, whether or not, in your judgment, she knew or could comprehend the nature of the instrument she was signing? A. No, she did not; with all of that opiate and everything, of course, she could not. . . . Q. I believe you said, Dr. Hendrix, that during all of this period of time that you were attending her, from the 5th to the 16th, she was critically ill? A. Yes, sir, she was critically ill until after the 21st; then she got a little better.'' Cross-examination: ''I am eighty years old; seventy-eight, when I visited Mrs. Vining. . . . Margaret Ramage (defendant), is, I think, a competent practical nurse. . . . Mrs. Ramage was there for about three weeks, I do not remember how long, attending to the patient. I left medicine with the nurse to give four doses a day. I did not give any medicine myself. She gave it. . . . I do not deal with the kind of nurses that would not give medicine as directed. . . . Q. Have you got any feeling in this case, Doctor? A. Any feeling? Q. Any feeling? A. Yes, I think I have. Q. Would that be such as to bias or prejudice your evidence? A. No. Q. It would not? A. No. . . . Mrs. Vining first became delirious when I commenced giving her opium; I commenced on the 5th, and gave her half a grain of opium contained in what is called Dover's powders. I went back that night; that is my treatment for pneumonia and hemorrhage of the bowels. I was treating her for pneumonia in this instance; sometimes I gave her quinine and sometimes asperin, but not at the same time. Referring to my book, my visits continued from February 5th to February 28, 1922, the last one appearing on March 6, 1922.''

Defendant, Margaret Ramage, testified that she had known plaintiff for thirty-eight years or more, during which time defendant had, at intervals, resided in New London. For approximately nineteen years of her acquaintance with plaintiff, defendant, according to her own testimony, had resided at various places some distance from New London, during which period of time defendant saw plaintiff infrequently. For several years during the time that defendant resided in New London, defendant was the switch-board operator in the local telephone exchange, and at other times she appears to have acted in the capacity of a practical nurse. Defendant testified: ''In 1916, I moved back to New London; lived between two and three blocks from Mrs. Vining; lived there six years; from there I moved to where I now live, just across the street, and a half block from Mrs. Vining, and lived there in February, 1922. After I moved back to New London in 1916, I saw Mrs. Vining five or six times a week. She would

ask me to come over at times. From 1916 up to February, 1922, it was just the same as it had been—I would help her with her home, and the house; Mrs. Vining never paid me anything for these services. . . . Early in February, 1922, Mr. Bud Brown came after me and I went to Mrs. Vining's home. It was on Saturday, the 4th day of February. . . . When I got to Mrs. Vining's on Saturday afternoon in response to Bud Brown's call, Mrs. Vining was sitting in a chair. She said, 'Maggie, I am not feeling very well; I am going to have pneumonia, I am afraid; don't you leave me.' . . . I called Dr. Hendrix on Monday morning, the 6th of February. The Doctor was not there before that time, and the doctor came in response to the call between eight and nine o'clock. I called him by 'phone. When the Doctor came, he felt of her pulse and left medicine with me with directions. He left two Hinkle pills and said, 'You give her one of these pills this morning and that will clean up her liver and her bowels;' and he left a little brown pill and said, 'Now, you commence giving this in the morning, but do not give it until after those Hinkle pills act.' I gave her one Hinkle pill that Monday morning and gave her one that night at nine o'clock; that was all she had; that was on Monday, the 6th. On the following day, Tuesday, I gave her one of those brown tablets. He said to give her one every four hours, and I began at eight o'clock A. M. I do not know what those pills were; he said they were quinine, in case fever should come up. . . . Q. You never did see Mrs. Vining at any time when she was ill—that is, you never nursed her through any spell of sickness when she was ill enough to have a physician, until this last one in 1922? A. That is all.''

The scrivener who drafted the deed in question was one Frank C. Hendrix, a practicing attorney in New London. Although bearing the same surname as the physician who attended plaintiff during her illness in February, 1922, Frank C. Hendrix, the scrivener, apparently is not related to Dr. Hendrix, the physician. The scrivener, Frank C. Hendrix, testified that Dr. Hendrix in person called upon him on Monday evening, February 6, and informed him that Mrs. Vining wanted some papers drawn, and that, pursuant to Dr. Hendrix's request, he went to Mrs. Vining's home on the following morning, February 7, 1922. The scrivener's version of what occurred on that morning is thus stated in his own words; ''Mrs. Vining said that she wanted to deed Maggie Ramage her property, her personal property and her real estate, her home, and she gave, as her reason for deeding this, that Mrs. Ramage had looked after her, and had been a friend of hers, and had helped her for the last forty years; . . . and she says, 'I want you to fix that so that Mrs. Ramage will get the property at once; I want to live here while I live; I want Maggie to have it.' . . . I took the notes of what she told me she wanted

74

done—just took it on a piece of paper, and went up to my office; and I asked her if she had a deed, and she said she did not, and so I went to my atlas and looked up the—aimed to look up the lot or the block, and I happened to look down the block—just a block south of it, and got the description in a block south, in place of the block up here by the school house. . . . When I arrived Mrs. Epperson met me at the door. Mrs. Epperson, Mrs. Vining and myself were all that were at the house. Mrs. Vining was lying on a cot or davenport, kind of propped up. . . . I knew she was sick; Dr. Hendrix told me she was sick and wanted some papers drawn. I didn't think she was extra sick. I talked with Mrs. Vining and ascertained what she wanted, and went to my office and prepared a deed and a will; both instruments were written at my office at the same time. It was between eight and nine o'clock when I went there. I don't know how long it took to write the instruments; I dictated them to the stenographer. I went back before noon and took the deed and the will; I don't know the exact time, and Ed Conn and Harry Wood went with me. Mrs. Vining said she wanted Ed Conn and Harry Wood to witness her will, and Ed Conn took the acknowledgment to the deed. He was circuit clerk. . . . When the witnesses, Conn and Wood, and myself got there, Mrs. Margaret Ramage (defendant) and Mrs. Epperson were also there, and Mrs. Vining (plaintiff); Dr. Hendrix was not there then, but he came in after the deed had been signed, and the will had been read and signed, and the witnesses had signed. Dr. Hendrix was not there until after the deed was signed and acknowledged and the will was signed; he came in when the witnesses had just signed the will. I asked him if he wanted to sign the will and he said, 'No.' He did not say anything else. . . . She (plaintiff) was propped up on the cot or bed, and I read the papers to her and handed them to her. As I recall, she signed the deed first; I read the deed in the presence of those people there with the description like it is here in the deed. . . . After the deed was signed, it was handed to Mrs. Ramage (defendant) by Mrs. Vining (plaintiff). Mrs. Vining had the deed in her hands when she signed it; Conn put his signature and seal on the deed right there at the time. Mrs. Vining was the one that handed the deed to Mrs. Ramage. Conn asked Mrs. Vining if it was her free act and deed; Mrs. Ramage did not say, 'Of course, she acknowledges it; of course, she does.' I don't know just where Mrs. Ramage was, she was around there somewhere; Mrs. Ramage was not holding Mrs. Vining up in bed; wasn't anybody holding her up. . . . I had never talked to Mrs. Vining prior to that time about a will or deed. She had suggested some time before that if she did not find Jim Allison (an attorney) she wanted me to fix some papers for her, he (Allison) is gone so much of the time. Some time before, I don't know the exact date, Mrs. Ramage (defendant)

told me that Mrs. Vining (plaintiff) was going to fix up some papers in which they were going to have a settlement of some kind, and she (Mrs. Ramage) says, 'If she wants anything, why you call me to fix those papers,' and I promised I would, if she (Mrs. Vining) called on me, and that is the only thing that has ever been said. That was either a year and a half, or two years ago; I mean a year, or such a matter, before those papers were drawn up. She (defendant) advised me there was going to be some papers drawn in settlement. That is the only conversation I had with Mrs. Ramage prior to the time I went to Mrs. Vining's home. She (defendant) was there on my second visit, and when the papers were executed. When the papers were executed, I would read a part and ask Mrs. Vining if that was what she wanted—then I would read more, and went over it, as she (plaintiff) is a little hard of hearing; I think I read some of it twice; that was in the presence of Mrs. Ramage (defendant), witnesses Wood and Conn, and Mrs. Epperson. Dr. Hendrix was not there. . . . I didn't see Mrs. Ramage when I first went over, and at that time had no conversation with her about the deed. . . . Mrs. Vining said she wanted to deed to Mrs. Ramage the entire tract of land at the home place. I read the entire deed to her and the will; read part of the will and inquired of her if that was the way she wanted it, and proceeded. On the first call, Mrs. Vining gave me the names of relatives and told me to disinherit certain ones, and the reason why she wanted this done, and the property she wanted each to have. . . . She enumerated the relatives from memory and had no instrument there. About a year before, Mrs. Ramage said something to me about the matter, and said if Mrs. Vining called me to prepare some papers that she was to be notified. Mrs. Ramage did not talk to me on the 7th. I had no communication with Margaret Ramage on February 7, 1922. . . . Q. And you and Mrs. Ramage had no conversation, and she gave you no directions or information about the deed? A. All the information she ever did say about the papers was when she was going to fix some papers a year or two before that. Q. If I understand you correctly, the only conversation that you ever had with Mrs. Ramage about this transaction, prior to the execution of these instruments, occurred more than a year before? A. I think it did. It is my recollection it is more than a year. Q. And Mrs. Ramage mentioned the matter to you? A. Yes, sir. Q. And she simply told you that Mrs. Vining was going to execute some papers, and if she called on you to prepare the papers, Mrs. Ramage wanted you to call her, Mrs. Ramage? A. That is what she said. Q. You had no conversation with her (defendant) on the 7th day of February, 1922, and you had no communication with her of any kind or character with reference to the

Vining matter, from the time she (defendant) talked to you more than a year before? A. I think that is correct, so far as I know. . . . Q. Now then, you went over there, and you had this long conversation with Mrs. Vining, and you then went back to your office and dictated the will and the deed, both—you went and hunted up the witnesses, and went back to the Vining home, and there you read over this will, parts of it two or three times, and read over this deed, and the same were executed there, both of them, and the deed was filed for record at fifty-five minutes after ten o'clock; and this transpired in that length of time? A. It transpired in that length of time; yes, sir.''

The acknowledgment of plaintiff to the deed in controversy was taken by one Ed Conn, who was the Clerk of the Circuit Court of Ralls County. Witness Conn testified: ''As well as I remember, they propped her (plaintiff) up in bed with some pillows, and Mrs. Ramage (defendant) held a book or a little board for her to sign this deed on. Q. Was there anyone supporting her, sitting up there? A. Well, I could not say; Mr. Hendrix and Mrs. Ramage were there about her, about the bed. . . . Q. From your best recollection there of her, Mr. Conn, what was your information or impression as to whether she was sick, or otherwise? A. It seemed like she was sick. Q. I will ask you if she did not look like she was very sick? A. Well, I do not know whether I may say or not, but she looked like a sick woman, and she was groaning some, and complaining some. . . . Q. Mr. Conn, she did not know any more about that deed, or what was happening to her, as if it had been done in her sleep, did she? A. I can give you my opinion. Q. That is what I want. A. As long as I have known Mrs. Vining, for the last twenty-five years, I do not think she ever was capable of making any kind of an instrument of writing, or understanding anything. Q. And you do not think she was capable on that day, do you? A. No, I do not. . . . Q. Now, Mr. Conn, when you took this acknowledgment, you asked her if this was her own free act and accord? A. Sure. I first asked her if she knew that was a deed she was signing, and she did not understand me the first time. Q. Now, you asked her if she knew that was a deed she was signing, because you seriously doubted whether she knew, didn't you? A. Well, I don't know what made me ask her. . . . Q. But, on this occasion, you did ask Mrs. Vining if she knew this was a deed that she was signing? A. I did, yes, sir. Q. And you did that because you had your misgiving about whether she knew, or not, did you? A. I could not say. Q. Well, that is your best impression now? A. Well, I don't know. Q. As you said awhile ago, you never did think she was capable of making a deed? A. I never; that is my opinion; I might be wrong. Q. You have known her pretty well? A. I have

known her for twenty or twenty-five years, maybe thirty. Q. Now, when you asked her if she acknowledged this deed, or rather, whether she did acknowledge this deed and execute it as her free act and deed—you say she said, 'Yes?' A. Yes, sir. Q. What did Mrs. Ramage say at that instance—and before Mrs. Vining had a chance to answer? A. I heard Mrs. Ramage say, when I hollered out the last time, that Mrs. Ramage—or Mrs. Vining did—I asked her if she signed that as her own free act and deed. I heard Mrs. Ramage say, 'Of course, she did; of course, she did.' Q. 'Of course, she did,' and then Mrs. Vining answered, 'Yes?' A. Mrs. Vining said she did. . . . Q. And during the entire transaction, now, you never heard Mrs. Vining utter more than a single 'yes' or 'no?' A. That is all. Q. While you were there? A. That is all I heard her say.''

. Mrs. Epperson testified that she is the wife of a nephew of defendant, and that she was present at the time of the execution of the deed in controversy. On cross-examination, she testified: ''Q. You and Mrs. Ramage are very friendly—very close? A. We are friendly. Q. And very close—is that true? A. Good friends. Q. I will ask you: Do you consider Mrs. Vining—from what you saw of her during that time, and on this 7th day of February, did you consider her as perfectly sound mentally? A. Well, I don't know. Q. As a matter of fact, you did not think she was, did you? A. She was as she always was. Q. She was as she always was? Now, on this occasion, you did not consider her just quite right, did you? A. Well, I don't know. Q. Did you ever express yourself that she was not right mentally? A. I do not know, I do not remember. . . . Q. I will ask you if you did tell Mrs. May D. Scott or Mrs. Lillie Hunt, there in New London, sometime after the incident of the signing of this will and this deed, that you did not believe Mrs. Vining knew a thing about the deed, as 'Aunt Maggie' had to hold her up, or words to that effect? A. I do not remember. Q. You will not say that you did, and neither will you say that you did not say it—will you? A. I do not remember. Q. Well, I am asking you, point blank, Mrs. Epperson, will you say that you did not use that language, which I have just repeated to you, to these two women, Mrs. Scott and Mrs. Hunt? A. Well, I will say I do not remember it. Q. You do not remember that you said it, but you will not say that you did not say it, will you? A. I do not remember. Q. In other words, you might have done it, mightn't you? A. I do not remember. Q. You do not remember it; but you might have done it? THE COURT: Is it true that you might have made such a statement? A. Perhaps; I do not remember it.''

Several witnesses testified that Mrs. Vining (plaintiff) was unable to intelligently comprehend and discuss business matters during the

first two or three weeks of her illness in February, 1922. Witness Ristmiller, a farm tenant of plaintiff, testified that he called upon plaintiff on the afternoon of February 6, 1922, to discuss with her the sale of some rent corn, and that plaintiff's conversation was not responsive to the business transaction he was then attempting to discuss with plaintiff; and witness stated that he is of the opinion that plaintiff was mentally incapable of transacting business of any kind on the day of his visit. Mrs. Fells, a neighbor of plaintiff, who had been acquainted with plaintiff for thirty-five years, testified that she called at the home of plaintiff on February 10, 1922, and that plaintiff did not recognize witness, and that plaintiff addressed witness by the name of another person. Mrs. Sarah Johnson, a niece of plaintiff, testified that, upon being advised of plaintiff's illness, she came from St. Louis to attend plaintiff in her illness, arriving at plaintiff's home on February 10, 1922, and that plaintiff did not recognize witness until several days after witness's arrival. Dr. Hendrix emphatically denied that he had requested the scrivener, Frank Hendrix, to call upon plaintiff for the purpose of preparing any papers or instruments of any kind, or for any purpose whatever, or that plaintiff had requested him to call the scrivener during the time of plaintiff's illness.

Respecting the employment of the scrivener, defendant testified on cross-examination: ''Q. Now, Mrs. Ramage, you didn't have anything to do with telling Mr. Hendrix about fixing up that deed? A. No, sir, I did not. Q. You are sure you never told Mr. Hendrix how to write this deed, or tell him what to put in it, you are sure of that? A. I am sure of that. . . . Q. You did not ask him anything about any—A. (interrupting) I am sure of it. Q.—deed; she did that alone, without suggestion from you? A. She did. Q. And you never told her to do it? A. I did not. . . . Q. You did not tell Mr. Hendrix what to put in there? A. I did not. Q. And you did not tell Mrs. Vining what to put in there? A. No, sir. Q. And you had been, and you were, entirely ignorant of the deed? A. I didn't know anything about it. Q. Do I understand you, Mrs. Ramage, to say that you were not a party to that at all; that is, in other words, that you had no hand in shaping up that—? A. I did not. Q. To get it done? A. I did not; I just called Mr. Hendrix, as I understood—Q. You called Mr. Hendrix because Mrs. Vining told you to call him, is that it? A. Yes, sir. Q. You did not conceive the plan of calling Mr. Hendrix? A. Yes, sir, I wanted him for both parties. Q. You wanted him for both parties, but you did not know what was going in the deed, and you didn't tell him? A. I didn't tell him; I didn't know anything about it. . . . Q. You are quite positive that you did not have anything to do with the making of those deeds? A. Yes, sir, I am. Q. Or

offer any suggestion, or had any information to give, or any suggestions to make? A. I did not. Q. You took no part in the transaction at any time? A. No, sir. Q. At all? A. No, sir. . . . Q. Now, you took no further interest in it, and you did not go ahead and tell Mr. Hendrix how to fix that deed? A. I did not. Q. Nor offer him any suggestions? A. I hadn't seen Mr. Hendrix for three months. I did not speak to him for three months; I didn't see him, absolutely. Knew nothing about it.''

Plaintiff testified as follows: ''I don't know anything about Frank Hendrix being at my house; I never sent for him or had anybody else send. Mrs. Ramage was there; she came through Bud Brown, but I never employed her. I never talked to Frank Hendrix about a deed or a will. I can't remember signing any will or deed about February 7, 1922. I don't know Ed Conn, or anything about his being at my house. I don't know Harry Wood; never seen him; never told Hendrix that I wanted those two to witness the will. I never had any discussion with Margaret Ramage about a deed to my home place; I don't owe Margaret Ramage anything. . . . I never wanted to deed Mrs. Ramage my place. This is the only time Mrs. Ramage took care of me.'' Cross-examination: ''That looks like my signature. It is my writing (referring to signature on the deed in controversy). . . . I tore up the will. I don't know Harry Wood and Ed Conn. I never made an acknowledgment before that clerk, Ed Conn, never seen him.'' Plaintiff testified that the first knowledge she had of the deed was when her niece, Mrs. Sarah Johnson, on February 12, 1922, read in the town newspaper that the deed had been recorded, and showed the newspaper to plaintiff. ''Q. The first thing you knew of it was when Sarah (plaintiff's niece) began to talk about it? A. She got the paper to the bed and pointed it out, and she says, 'What does all this mean?' Q. And she came in a hurry, didn't she, Mrs. Vining? A. I guess maybe she came in a hurry; I don't know whether she did or not. . . . Q. And she thought you ought not to make that deed, isn't that true; didn't she tell you so? A. Why, yes. Q. Why, sure she did; now then, was there anybody else besides Sarah and Mrs. Fells that told you you ought not to make it? A. Oh, I don't know; there may have been a whole lot of them. Q. Well, do you recall anybody, or Dr. Hendrix? A. Dr. Hendrix, yes. Q. Yes; the doctor told you to avoid it, didn't he? A. Yes. Q. Told you how to avoid it, didn't he? A. I don't remember. Q. Well, your best impression is that he did, didn't he? A. Well, I don't know. Q. Well, you think he did, don't you? A. Well, he might have. Q. Well, the Doctor said you ought not to do it, didn't he? A. Well, he might have. Q. And he told you that you could avoid it, if you wanted to, didn't he? A. I don't know; I don't know about that. . . . Q. And Dr. Hendrix told you to

undo it? A. Yes. Q. And they told you that you had to be very sick to do that, didn't they? A. Yes. Q. They told you that that took the place away from you right now, didn't they? A. I guess so. Q. Well, isn't that what the Doctor told you, that it took your place right now? A. I don't remember exactly. Q. Well, that is what Sarah said, wasn't it, that it took your property now, the deed went now? A. Well, that was to take my property. Q. Well, that is what Sarah told you? A. Yes. Q. And the Doctor told you how to evade it, didn't he? A. Yes. Q. And that is what you are trying to do, and that is what you want to do, isn't it? A. I am going to hold my home. Q. Don't make any difference what happens, you want to undo it? A. Yes. I don't know anything about signing a paper. I don't want to be put out in the street. They did not tell me that I had a reservation of a life estate and I had the property as long as I lived. I wanted a home. . . . Q. Is that what the Doctor told you, you didn't have to know 'nothing?' A. I don't know anything at all about it; this was all jumbled up; I ain't going to tell you when I don't know anything about it. I don't know one thing about that, not a thing. Q. You were aiming to deed it after you died, wasn't you? A. Oh, I don't know. Q. Is that what the Doctor told you? A. No.''

The cause was submitted to the trial court, without the aid of a jury, and the court found all of the issues for plaintiff and against defendant. The trial court made and entered a finding of facts, in which the court found that no agreement was entered into between plaintiff and defendant on, or at any time prior to, February 7, 1922, whereby plaintiff was to sell and convey to defendant the land in controversy; that no consideration passed from defendant to plaintiff for the sale of said real estate, or for the execution of the deed in question; that there was no mutual mistake of the parties as to the description of the land recited in said deed of February 7, 1922, and that the scrivener who prepared said deed was not the agent of both plaintiff and defendant, and was not acting under the direction of both parties in the preparation of said deed; that on February 7, 1922, the plaintiff was critically ill, and was unconscious and irrational and entirely oblivious of her surroundings, and was mentally incapable and incompetent of transacting any business, and of selling or transferring her property, and of executing said deed of February 7, 1922, and that plaintiff did not, of her own volition and consciously, execute said deed; and that said deed is not the act and deed of plaintiff, and is therefore null and void. The judgment of the trial court is to the effect that plaintiff have and hold the absolute fee-simple title to the real estate in question, together with the personal property described in the deed of February 7, 1922, free and clear of any claim or interest of defendant, and that said deed be declared and

adjudged to be cancelled, annulled and of no effect. After unsuccessful motions for new trial and in arrest of judgment, defendant was allowed an appeal to this court from the judgment entered *nisi*.

· I. Appellant (defendant) contends that the several defenses to the deed of February 7, 1922, pleaded in the reply, are inconsistent, and that the judgment is not responsive to the issues raised by the pleadings. Appellant argues that, because the reply, which is verified by the affidavit of plaintiff, specifically denies the execution by plaintiff of the deed of February 7, 1922, such special denial or traverse amounts to a plea of *non est factum,* and that the plea of *non est factum* is inconsistent with the further averment of the reply that plaintiff, by reason of her critical illness and the opiates administered to her, was mentally incompetent and incapable of executing said deed, and of transferring and selling her property, and that her signature and acknowledgment to the deed were procured by defendant while plaintiff was in a weakened, irrational and mentally incompetent condition. The answer of defendant, by way of cross-petition, pleads the execution of the deed of February 7, 1922, and the delivery of said deed by plaintiff to defendant, and seeks affirmative relief by way of reformation of the deed. The reply traverses and denies the issue of fact thus tendered, by way of cross-petition, in the answer. The reply not only denies that plaintiff executed the deed pleaded in the answer, but also avers, in the alternative, that plaintiff has no recollection of signing and acknowledging said deed, and if her signature and acknowledgment were procured to any deed, and particularly to the deed alleged in the answer, the same were procured while she was in a weakened, irrational and mentally incompetent condition. The reply prays affirmative relief in that the court is asked to adjudge and decree said deed to be cancelled, annulled and of no effect. We do not regard the several defenses to the deed in controversy, as averred in the reply, to be inconsistent. But, even though they be inconsistent (and, according to our judgment, they are not), the objection must be deemed to have been waived because of the failure of defendant to file a motion to strike, or a motion to elect. The proper remedy for inconsistent defenses is a motion to strike, or a motion to elect, and if no such motion is made, or if the objecting party does not stand upon such motion when made, the objection will be deemed waived. [31 Cyc. 151; Luna v. Williams, 190 Mo. App. 266, 271.] We find the judgment to be responsive to the issues raised by the pleadings, and the assignment of error upon that ground must be denied.

82

II. Appellant insists that the findings and judgment of the trial court are not supported by substantial evidence, and are against the weight of the evidence. We have given careful study and consideration to the evidence herein, and we are convinced that not only is there substantial evidence upon which to predicate the findings and judgment of the trial court, but also that the evidence, when considered in the light of the surrounding circumstances, preponderates in favor of the plaintiff.

The evidence, without serious dispute or contradiction, shows that plaintiff was confined to bed because of illness on the day when the deed in controversy was executed, and that her illness had commenced several days prior to the date of the execution of the deed. Defendant, by her own testimony, admits that she had been in attendance upon plaintiff, as a nurse, for at least three days prior to the date of the execution of the deed. The scrivener who prepared the deed admitted that he knew at the time that plaintiff was ill, and that she was confined to bed, and the witnesses, Conn and Wood, who were present at the execution of the deed, likewise testified that the appearance of plaintiff indicated that she was a sick person. Witness Conn testified that "she looked like a sick person, lying there on the bed; she was complaining some; groaning some." Conn, who was one of defendant's witnesses, and who took plaintiff's acknowledgment to the deed, expressed the opinion, based upon twenty-five years' acquaintance with plaintiff, that she was not mentally capable of understanding or making any instrument of writing at the time of the execution of the deed, or at any other time; that she used the monosyllabic words, "yes" or "no," in answering the inquiries made of her by those present, and that, upon plaintiff being asked by Conn whether she acknowledged the execution of the instrument as her free act and deed, defendant prompted plaintiff by saying, "Of course, she did; of course, she did." Dr. Hendrix, the attending physician, testified that plaintiff was critically sick with pneumonia at the time of the execution of the deed, and that, during the first week or ten days of her illness, she had a high fever and, at times, was delirious and unable to recognize friends and acquaintances who called upon her. The testimony of plaintiff's tenant, Ristmiller, and of her neighbor, Mrs. Fells, tends to corroborate the testimony of Dr. Hendrix respecting plaintiff's inability to intelligently discuss business matters and her inability to recognize acquaintances shortly prior, and subsequent to, the day of the execution of the deed. It is not disputed that Dr. Hendrix was present and observed plaintiff's mental and physical condition immediately after she had signed the deed, and while defendant, the scrivener, Conn, Wood, and Mrs. Epperson were present and

about the bedside of plaintiff. The scrivener testified that Dr. Hendrix came into the room just after plaintiff had signed the deed, and Mrs. Epperson also testified that Dr. Hendrix came into the room at the time Conn was putting his seal upon the deed in certification of the acknowledgment. Dr. Hendrix testified quite positively that plaintiff was under an opiate at the time, and that her mental condition was such that she could not understand a business transaction or comprehend the nature of the instrument she had just signed. While it is true that Dr. Hendrix admitted, on cross-examination, that he had some feeling in the matter, yet he also stated that his feeling in the matter did not influence or affect his testimony. Certain it is that the record does not disclose that Dr. Hendrix had any direct interest in the matter, pecuniary or otherwise, and whatever feeling he may have had in the matter was doubtless due to his belief that plaintiff was mentally incompetent at the time, and incapable of understanding the nature and effect of her act in signing the deed, and, therefore, he may have harbored the thought or feeling that plaintiff had been imposed upon in the transaction.

It is true, as argued by defendant, that the testimony of the scrivener (which is to the effect that, upon his first visit with plaintiff on the morning of February 7, 1922, plaintiff gave explicit directions as to the contents of both the deed and the will, and that such directions were given by plaintiff without the aid of any memorandum or writing, but wholly from her memory respecting her property and her relatives) is indicative of the fact that plaintiff comprehended and understood the nature and effect of her acts in signing the deed and in making the will. However, the testimony of other witnesses, who were present at the time plaintiff signed the deed and the will, is far from being positive or convincing that plaintiff comprehended the nature and effect of her acts, or that she had sufficient mental capacity at the time to understand the nature of the transaction, and to voluntarily enter into and consummate the same. For instance, Mrs. Epperson, when asked on cross-examination whether she considered, from what she saw of the transaction, that plaintiff was mentally sound on February 7, 1922, and whether plaintiff "was just quite right," answered the inquiry by saying, "I don't know;" and, when pressed further by counsel and by the trial court as to whether she had made the statement to other persons that she "did not believe Mrs. Vining knew a thing about the deeds," witness equivocally answered, "Perhaps; I do not remember it." The testimony of defendant's witness, Conn, likewise casts doubt upon plaintiff's mental competency and capacity to understand the transaction and the nature and effect of her act in executing the deed.

We have said that the evidence must be considered in the light of the surrounding circumstances. It appears from the record

herein that the deed in controversy was filed for record in the office of the Recorder of Deeds of Ralls County at 10:55 o'clock on the morning of February 7, 1922, within only a very few minutes after the deed had been signed by the plaintiff. No explanation or reason for the unusual haste in filing the deed for record is offered by defendant. Why the haste in filing the deed for record within a very few minutes after it had been signed by plaintiff, and when the signature of plaintiff had scarcely become dry upon the paper deed? The unusual haste in filing the deed for record is, to say the least, a significant circumstance in the case which called for some explanation on the part of defendant, and standing unexplained upon the record, as it does, gives rise to the inference that defendant had little confidence in the regularity and good faith of the transaction.

Another circumstance to be considered is the apparent inadequacy of the consideration for the deed. The deed purports to have been made for a consideration ''of one dollar and services rendered'' to plaintiff by defendant. The answer of defendant, by way of cross-petition, pleads affirmatively that, upon February 7, 1922, for valuable consideration, an agreement was duly entered into between plaintiff and defendant, whereby plaintiff sold to defendant, and defendant purchased of plaintiff, the land in controversy, which constituted the home place or residence of plaintiff, and defendant testified that the deed was made in pursuance of a prior agreement between defendant and plaintiff, to the effect that plaintiff was to convey her home to defendant in consideration and payment of services rendered by defendant. The cause was tried on the theory of defendant that she had purchased the land from plaintiff for a valuable consideration. It is, perhaps, appropriate and pertinent to mention here and now that, by the terms of the will which was prepared by the scrivener who drafted the deed, and which will defendant's witnesses say was executed by plaintiff at the time of the execution of the deed, plaintiff purported to devise to defendant, Margaret Ramage, another tract of land than the home place, comprising 117 acres, with the recital in the will that ''this bequest is made because of services rendered me by Margaret Ramage and with the distinct understanding that she is to look after me in sickness and care for me in my declining years as a daughter would for her mother without any further charges for her services than the property that I have heretofore deeded her and this land which I hereby will her.'' Plaintiff testified that she did not remember signing a will, and that she had never employed Hendrix, the scrivener, to write her will, although she further testified that she had torn up a will, which she thought had not been written by Hendrix. Defendant testified that she had rendered services to plaintiff for forty years prior to the execution and delivery of the deed. But, according to her own testimony, defendant resided at

places considerably distant from New London for nineteen years or more, during which time she saw plaintiff infrequently, or, as defendant testified, perhaps once or twice a month. During defendant's residence in New London she was actively employed for some considerable time as a telephone switch-board operator. Concededly, according to her own testimony, defendant at no time resided with plaintiff, or in the same house with plaintiff. Defendant says that she nursed plaintiff during spells of sickness, but it further appears from defendant's testimony that only once, in February, 1922, was plaintiff sick enough to require the attendance of a physician. Most of the services which defendant undertook to detail were apparently mere social visits with plaintiff, or "shopping trips" to near-by stores made at the request of plaintiff; in other words, the so-called "services" seemingly consisted of those little neighborly acts, or kindnesses, which one neighbor so often voluntarily does for another, especially in a small village, such as New London. At any rate, defendant testified that she never asked pay of plaintiff for such services and never presented plaintiff with a bill for services; and, furthermore, defendant kept no record or account of her calls and visits upon plaintiff, or of any services rendered, until January 1, 1922, when, as defendant says, "I began to keep an account of my visits; did not make any charge; it was simply a running diary." However, defendant did not put the "running diary" in evidence at the trial. In Allore v. Jewell, 94 U. S. 506, 511, a case quite similar in the substantive facts to the case at bar, the Federal Supreme Court, speaking through Mr. Justice FIELD, said: "It may be stated as settled law, that whenever there is great weakness of mind in a person executing a conveyance of land, arising from age, sickness, or any other cause, though not amounting to absolute disqualification, and the consideration given for the property is grossly inadequate, a court of equity will, upon proper and seasonable application of the injured party, or his representatives or heirs, interfere and set the conveyance aside. . . . The principle upon which the court acts in such cases, of protecting the weak and dependent, may always be invoked on behalf of persons in the situation of the deceased spinster in this case, of doubtful sanity, living entirely by herself, without friends to take care of her, and confined to her house by sickness. As well on this ground as on the ground of weakness of mind and gross inadequacy of consideration, we think the case a proper one for the interference of equity, and that a cancellation of the deed should be decreed." A somewhat similar thought is expressed by Judge BRACE, speaking for this court, in Ennis v. Burnham, 159 Mo. 494, 518, wherein he said: "That the inadequacy of the consideration and the unfairness of the bargain must have been palpable to the healthy, discerning eyes of the grantees cannot be doubted. That the grantor did not compre-

hend and did not intend to execute a deed of the purport of this one, is fairly inferable from the evidence.''

In cases of this kind and character, the legal test to be applied is, Did the grantor have sufficient mental capacity, at the time of the transaction, to understand the nature of the particular transaction, and did she, with such understanding, voluntarily enter into and consummate the transaction? [Masterson v. Sheahan (Mo. Sup., en banc), 186 S. W. 524, 526.] The evidence to which the foregoing test is to be applied in this case is conflicting. If the testimony of plaintiff's physician, Dr. Hendrix, and the testimony of acquaintances and friends who saw plaintiff shortly before and after the day on which the deed was executed, be true, then plaintiff did not have sufficient mental capacity to understand the particular transaction in hand, and was therefore not mentally capable of making a valid deed of conveyance. There is nothing disclosed by the record before us which tends to show that Dr. Hendrix has any direct interest in the matter, and the same may be said concerning the neighbor, Mrs. Fells, and the plaintiff's tenant, Ristmiller. It has been said by this court that witnesses who bear close family, social or business relations to the grantor in a deed possess the most favorable opportunities for observing and knowing grantor's mental condition, and usually their testimony as to the grantor's mental condition and capacity is entitled to great weight. [Holton v. Cochran, 208 Mo. 314, 417; Jones v. Thomas, 218 Mo. 508, 541.] On the other hand, if the testimony of defendant, and that of the scrivener, be true, then plaintiff understood the nature and extent of the transaction in hand, and voluntarily entered into and consummated the same by executing the deed. Plaintiff, by her own testimony, denied that she had any knowledge or recollection of the transaction. Plaintiff's testimony, as set out in the printed record, is more incoherent than clear, but her confusion and incoordination of thought and expression while on the witness stand may, or may not, have been attributable to her unfamiliarity with court surroundings rather than to mental weakness. The learned trial court, however, saw the parties and heard them testify, together with their respective witnesses, and was thereby afforded the opportunity of observing the demeanor of the parties and their respective witnesses upon the witness stand, and their manner of testifying. Such opportunity is necessarily denied to us. In equity cases, notwithstanding that this court has the unquestionable right to review and weigh anew the evidence, our usual practice is to defer to the findings and judgment of the trial chancellor where the evidence is conflicting, and where the findings and judgment of the trial chancellor are largely dependent upon the appearance, demeanor, and credibility of the witnesses; provided, of course, there is substantial evi-

dence upon which to predicate such findings and judgment. [Boggess v. Boggess, 127 Mo. 305, 322; Jones v. Thomas, 218 Mo. 508, 540; Huffman v. Huffman, 217 Mo. 182, 191.]

III. In view of what is said in the preceding paragraph of this opinion, it becomes unnecessary for us to discuss and rule the **further** questions raised in the briefs of the respective parties, namely, whether the scrivener was the agent of both parties to the deed, and whether the mistake in describing the land in the deed was the mutual mistake of the parties. If the plaintiff was mentally incompetent to execute the deed, then the deed was voidable, and upon the insistence of plaintiff was properly cancelled and annulled by the decree of the trial chancellor. Consequently, the questions of the agency of the scrivener and the mistake in the description of the land have no place in this opinion. Appellant assigns error in the admission and exclusion of evidence, but this being an equity case, this court will consider evidence improperly excluded by the trial court, and will treat as excluded evidence improperly admitted, without reversing the judgment for that reason. [State ex rel. v. Jarrott, 183 Mo. 204, 218; Gibbs v. Haughowout, 207 Mo. 384, 391; Jones v. Thomas, 218 Mo. 508, 544.]

We are of the opinion that the judgment of the circuit court should be affirmed. It is so ordered. *Lindsay* and *Ellison, CC.,* concur.

PER CURIAM:—The foregoing opinion by SEDDON, C., is adopted as the opinion of the court. All of the judges concur.