John STORM, an Insane Person, by Dewey Heath and Joe Davidson, His Guardians, Plaintiff-Appellant,

v.

Ray C. MARSH and Ola E. Marsh, Husband and Wife, and O. D. Clayton, Defendants-Respondents.

No. 52361.

Supreme Court of Missouri, Division No. 1.

Sept. 11, 1967.

W. Clifton Banta, Charleston, for appellant.

Robert A. Dempster, Dempster, Edwards & Robison, Sikeston, for respondents Ray C. Marsh and Ola E. Marsh.

David E. Blanton, Blanton, Blanton & Rice, Sikeston, for respondent O. D. Clayton.

WELBORN, Commissioner.

This is an action to set aside a deed on the grounds of lack of mental capacity of the grantor. The trial court refused to set aside the deed and the grantor's representatives appealed.

In 1945, John Storm's grandparents conveyed to him an 80-acre tract of land in the vicinity of Bertrand, in Mississippi County. John, a minor at that time, lived

with his grandparents until his grandfather's death in 1946. John, then some twelve years old, went to live with an uncle, Loren Storm. In July 1954, Loren filed an information in the Mississippi County Probate Court for inquiry into the sanity of John. On July 30, 1954, the court found John insane and ordered him committed to the hospital at Farmington. John spent some time in the hospital, apparently being readmitted one or more times.

In September, 1958, the probate court, on the petition of Loren as John's guardian, entered an order restoring John's sanity. Thereafter, John lived on and farmed the 80-acre tract. For approximately a year and a half he had a feminine companion residing with him on the farm. When she left, John apparently lost interest in farming the tract, and, according to one witness, "All he done was ride around in the car."

In October, 1960, David Tyler, a licensed real estate salesman employed by R. D. Clayton of Sikeston, a brother of defendant O. D. Clayton, was looking for farm land in the Bertrand vicinity which might be for sale. The persons farming the Storm land told Tyler that the 80-acre tract might be for sale, so Tyler sought out John. John told him that he did not want to sell his land, but that he might trade it.

Tyler had represented the sellers in a transaction in which O. D. Clayton had purchased a 76-acre farm in Scott County for $7300. Knowing that Clayton was a real estate trader, Tyler felt that he might be interested in exchanging the 76-acre tract for Storm's land, so he took Storm to examine the Scott County tract. According to Tyler, he and Storm looked over the tract and, without any particular discussion of the relative value of the two tracts, Storm said he might be interested in trading for a $9,000 difference.

The next day, October 6, 1960, Tyler and Clayton looked over Storm's land. Clayton thought that he might be willing to trade

on the basis of the $9,000 difference and they went to see Storm. Storm agreed to the deal and the parties went to Clayton's office where deeds were prepared. Clayton paid Storm $500, with the $8500 balance to be paid when the title had been approved. Storm executed the deed to Clayton and went with Clayton to Charleston, where the deed was recorded and a deed of trust on the property released.

Although the deed from Clayton to Storm for the 76-acre tract was dated October 6, 1960, the deed from the sellers to Clayton was dated October 7, 1960. Both were recorded in Scott County on October 18, 1960. On October 11, 1960, Loren filed a petition in the Mississippi County Probate Court for the appointment of a guardian for John.

On October 23, 1960, Roderic Ashby of Charleston, as attorney for John, filed a motion to dismiss the petition. On November 4, 1960, the motion was overruled and the matter set for hearing on November 18. However, the hearing was not held on that date.

John had no formal contract with Clayton, but had received an acknowledgment that Clayton owed him $8500. On December 9, 1960, John appeared at the office of Robert Dempster, a Sikeston attorney, and told Dempster that Clayton owed him $8500 on a real estate deal. Dempster got in touch with Clayton who came to Dempster's office with a draft for $8500. On the same date, a bank account was opened for John in a Sikeston bank. Part of the money was deposited in a savings account and part in a checking account. John directed that checks be drawn for debts which he owed and Dempster prepared such checks, including one payable to himself for $250, on which the notation "Retainer fee" appeared. Dempster said that the fee was for his services in closing the transaction and that he had not been retained to represent John in the competency proceedings. Dempster did represent John in those proceedings, but he could not recall when

he was employed for that purpose. Dempster acknowledged that he was probably involved in the last of December in prohibition proceedings pertaining to the probate court proceedings.

On December 13, 1960, Ray Marsh let Clayton know that he was interested in purchasing the 80-acre tract. The next day, Clayton called Marsh and they agreed on a price of $22,000. The transaction was closed on December 14, and a deed executed by Clayton to Marsh on that date was recorded December 17, 1960.

On March 17, 1961, John was adjudged incompetent and a guardian appointed for him. On December 22, 1961, the probate court authorized the guardian to file this action to set aside the deed. The petition which was filed alleged that the reasonable value of John's 80-acre tract was $25,000; that, on the date of the deed to Clayton, John was mentally ill, incompetent and lacking mental capacity to execute the deed; that Clayton, knowing John's condition, purchased the land for "a grossly inadequate consideration"; that, while incompetency proceedings were pending, the Marshes, knowing of such proceedings and of John's condition at the time of the sale to Clayton, purchased the property from Clayton.

The trial court's decree for defendants was without specific findings of fact.

What was the evidence offered to establish the lack of mental capacity on the part of the grantor? Evidence of adjudication of incompetency was admitted. However, the 1954 adjudication had been terminated and the second adjudication was not made until some six months after the deed. Although this evidence might have some bearing upon John's general mental state, it would not be conclusive as to his condition on October 6, 1960.

The medical testimony came from an osteopathic physician who had examined John in 1954 and again in 1961 and whose report was considered in the sanity proceedings. The witness, although not trained in psychiatry, had had practical experience in dealing with mental illness. He stated that, in 1954, he found John mentally ill, suffering from dementia praecox. According to the witness, at that time John "didn't talk much, * * * was very silent; he was uncooperative, unresponsive * * * had hallucinations and illusions." The doctor testified that he examined John on March 8, 1961. At that time, he found John "very unresponsive. I could only get a 'Yes' or 'No' answer out of him, and, again, he was hearing voices and he was quite unkempt at that time, apparently had no desire to keep himself clean and, * * * he was hitchhiking around the country." He concluded at that time that John was suffering from "a depressive type of mental illness." In answer to the question of whether on October 6, 1960, John "would have had sufficient mental capacity and insight in order to have sold his property," the witness stated: "My opinion is that he probably would not have been completely capable of making real sound decisions. * * * During all the time that I have known him, he is not acutely aware, apparently, * * * of the everyday happenings."

On cross-examination, the witness said that he was unfamiliar with John's activities in October, 1960, and that he could not say with any reasonable medical certainty that John was not, on October 6, capable of carrying on ordinary business affairs.

Such testimony, standing alone, can hardly be considered convincing. Storm, John's uncle with whom John lived for some eight years prior to the first adjudication, said that, as a boy, John "didn't seem to mingle with other children much, he was off to himself a good deal; outside of that, he was about normal * * *." When he started going to high school, he ran away from home. At that time "he talked religion a good deal and he acted kinda funny, peculiar. * * * And he looked funny out of the eyes quite a little." "[H]e'd be eating at the table maybe and

he would start to laugh, I would say 'what are you laughing about?' There wasn't nothing said that was funny, * * *." On one occasion, John threatened to kill Loren.

According to Loren, after John was hospitalized, "He acted pretty good for awhile." "He was acting pretty good" when restoration was ordered. "He acted pretty good for awhile until his wife, well, a woman living with him, until she left him and then he got worse." After the woman left, "he got a car and went to riding around, giving bad checks." "* * * [H]e wouldn't work, he would just run around and spend money." Shortly before he sold the farm, "he wouldn't have much to say, sometimes when I would see him, he would want to borrow money and if I would give him money, that was the end of it just as soon as we give it to him."

Loren's wife, Lena, testified that, in 1954, John "just stared at you and acted just wild or something * * *. He just looked like he was scared * * *, looked like he was off, unbalanced." She had seen John only twice in 1960, once at the store and once at Loren's house when he came to get money from Loren. "[H]e sure acted awful funny." "[H]e would just grunt, he wouldn't talk. He wouldn't have nothing to say to nobody, he would just look at you real wild looking * * *."

Noah and Dewey Heath owned the Dogwood Store, which was in the vicinity of John's land, and John was a customer of the store. Dewey, who had known John since he was five or six years old, said that, in 1954, before he was committed to Farmington, John "looked wild out of his eyes." "John wouldn't talk very much." "When you would ask him a question, when he would come in and want anything, he would mumble, you couldn't understand him, he would stare off in space." Two days before he ran away and the Highway Patrol picked him up, "he looked wild."

After his restoration, John started farming for himself, but "he didn't know just what he was doing or what it was all about." "After this woman left him, * * * John begin to drift off again." "He was again at his worst stage, like he was in '54." His conduct was "poor." "He looked wild. He wouldn't shave. He wouldn't keep clean or anything like that."

Noah Heath said that, in 1954, John "didn't look normal and he didn't act normal." "[H]e looked in a dazed condition, didn't look right out of his eyes." After he was released from Farmington, "He acted a little better than he did before." When he started farming for himself in 1958, he wouldn't talk, "just answer questions, but then, [the boy] didn't know how to farm or operate anything himself." The only time Noah saw John in the late summer and early fall of 1960 was when he came to the store. "[H]e was, I am pretty sure, drinking * * * and he got out and come back and he wanted $5.00, and I could tell he wasn't right, well, he was drinking."

H. W. Duke, who knew John from having clerked in the Dogwood Store for twelve years, testified that, in 1960, when John came to the store, "it was pretty hard to get anything out of John, he would come in the store, come in and stand around with his head down, you would ask John if you could wait on him, sometimes he'd answer you and sometimes he'd grunt and you couldn't tell what he was saying, eventually you'd get him waited on." "John didn't look too good, didn't look too healthy."

Harland Maxwell, a farmer living in the community, had known John for twenty years and seen him frequently around the Dogwood Store. In 1954, John "didn't talk, actually. You had to ask him a question, he would answer that question, that was about all. He would sit around with his head down, act very depressed." "[H]e had a far-away look in his eyes, he just didn't look normal to me." Maxwell saw John about once a week around the Dogwood Store in the summer and fall of 1960. John acted "[a]bout the same way.

Well, he just wouldn't hardly talk. You had to ask him a question before he'd say anything. He acted very depressed, had his head down most of the time when he was sitting around."

Joe Davidson, a co-guardian, who had known John since 1940 and for whom John worked when he was twleve, thirteen or fourteen years old, said: "I would say when you are around anyone like that, that you can tell when he is not too bright." "[Y]ou could tell him to go do something, he just couldn't do it and do it right, he tried but he just couldn't do it." "You couldn't get much talk out of him, always had his head down." John sometimes looked "wild." John worked for Davidson in 1957 and 1958. "[H]is conduct was better than at any other time and at one time he was working for me for about four months straight * * *. I thought he was in pretty good shape, then he went off and I just had to finally just quit working him, I was afraid he would get injured." John worked for Davidson in 1960, but Davidson quit working him because he "couldn't understand just how to do things." "I would say lot of times just looked wild and just wouldn't look at you and wouldn't tell you anything you understood." In 1960, shortly before John sold his farm, the witness saw John every day or two and "could tell he was getting worse. * * * Mental."

Except for Mrs. Storm, each of these witnesses expressed the opinion that John was not capable of handling his affairs at the time of the farm transaction.

However, the testimony of these witnesses, upon analysis, reveals little basis for the conclusion that John lacked the requisite mental capacity on October 6, 1960.

■ Uncommunicativeness is not necessarily evidence of mental incapacity. That characteristic of John appears to have most impressed the witnesses. The frequent reference to the "wild look" in John's eyes can hardly be accepted in lieu of testimony regarding John's actual capabilities to handle his property.

Although the owners and clerk at the Dogwood Store were of the opinion that John lacked capacity to manage his affairs, the store did a regular business with John, extending him credit in a sizable amount. In fact, in August, 1960, John executed two promissory notes to the Dogwood Store, one for $300 and one for $168, secured by a deed of trust on his land. The notes were paid by John's check for $500, dated December 9, 1960, this being one of the checks issued at John's direction upon completion of the deal with Clayton. The check was accepted and cashed and the deed of trust released.

■ Altogether, considering the observations which these witnesses recited as the basis of the opinions expressed by them, we do not feel obliged to accord weight to such opinions, particularly when the actual activity of at least some of the witnesses was wholly inconsistent with the opinions expressed by them. Nute v. Fry, 341 Mo. 1138, 111 S.W.2d 84, 87 [1-3].

Further bearing upon the issue of mental capacity was the testimony of John, who testified in his own behalf, although he was apparently still under the 1961 adjudication.

At the trial, held October 21, 1965, John, a high school graduate, testified that he had owned land around Bertrand that his grandpa left him and that he had traded. He said that he had talked to Marsh about borrowing some money and that Marsh sent Clayton over to see him about buying his land. John said that he and Clayton got to talking about the price of the land and that he told Clayton that he wanted about $24,000 for his land. Clayton told John that he had a farm that he'd like to trade and they went to look at the farm, which John described as in the vicinity of "Kelly High." (There was evidence that the Scott County farm was across the road

from a new school known as Kelly High School.) John said that he had no idea of the value of the Scott County land and that he asked no one about it, but that Clayton told him it was worth $150 per acre. According to John, he and Clayton talked one day and made the deal the next. John recalled that he received $500 when he signed the deed and that he was to get $8500 more. John's recollection was that he got the $8500 about ten days later and that he spent the money paying bills and buying a truck which he used in a coal hauling business that winter. John identified the $500 check to Heath and the $250 payment to Dempster. He said the fee to Dempster was "for writing the, O, paper of some kind." He identified a check for $350 payable to Aubrey Michael. He recalled that this was payment for seeding the 76-acre tract. (Michael testified that in the fall of 1960, John and Clayton came to his office in Benton and Storm asked him to double disc the Scott County land for him and sow it in rye and vetch. Michael agreed to do the work for $350 and did it.) He identified a check to Commercial Credit Corporation for $888.06 as a payment for a car and other checks prepared and issued when the $8500 payment was received from Clayton.

■ Our de novo review of the evidence leads us to conclude that the plaintiff failed to produce the necessary clear, cogent and convincing evidence of John's lack of capacity at the time of the execution of the deed to Clayton.

■ Although the law does require a greater mental capacity for an arm's length transaction than it does for a deed of gift, nevertheless the essential test in an arm's length transaction is the capacity of the grantor to "understand the nature of the act and to apprehend its consequences." 26 C.J.S. Deeds § 54b, p. 720; 29 Am.Jur., Insane Persons, § 77, p. 198; Masterson v. Sheahan, Mo.Sup., 186 S.W. 524, 526 [4]; Vining v. Ramage, 319 Mo. 65, 3 S.W.2d 712, 721 [5,6]. The grantor's own testi-

mony in this case clearly demonstrated that he recalled the transaction and understood its consequences. The witnesses who expressed the opinion that John was unable to manage his affairs in October, 1960 did not testify to facts which supported such opinions. Other than the Heaths, no witness testified as to facts involving John's capacity to engage in business transactions. The Heaths actually did business with him, and, although there was some effort to show that they did so in reliance upon Loren's taking care of John's account, Duke testified positively that he sold John on John's credit.

Thus, the only evidence relating to John's ability to conduct business transactions wholly failed to demonstrate lack of capacity on his part sufficient to cause us to set aside the deed. The evidence might justify a finding of some mental weakness on John's part, but not such a degree of impairment as would invalidate the transaction in question.

Plaintiff's representatives argue that there are factors, which, considered with John's mental weakness, would call for the nullification of this transaction. They point particularly to an alleged insufficiency of consideration received by John. According to plaintiff's guardians, John sold a farm reasonably worth $24,000 for $9,000 and a farm reasonably worth $4,500. However, the evidence does not conclusively show such a disparity. John did say that he wanted $24,000 for his farm and there was testimony of witnesses in the vicinity (Loren, the Heaths) that John's 80-acre tract was worth $300 per acre. Dewey acknowledged that in the 1961 competency hearing he valued the farm at $275 per acre. Clayton sold it to Marsh for $22,000 which was probably fairly indicative of its value.

■ Although plaintiff's witnesses depreciated the value of the Scott County farm and Clayton admittedly paid only $7300 for it shortly prior to the trade, there was testimony from Aubrey Michael,

the Scott County Collector who was not shown to have any interest in the litigation, that the value of the Scott County land was $150 per acre. We do not find that there was such a grossly inadequate consideration going to John as would indicate overreaching or taking advantage of his rather obviously unequal mental capacity and trading acumen.

■ Plaintiff's representatives also point out other facts to be considered, facts which might tend to indicate some doubts on the part of the defendants in the efficacy of the transaction with John. The fact that the deed was recorded on the same day is emphasized. Prompt recording was considered indicative of a grantee's doubts in Vining v. Ramage, 319 Mo. 65, 3 S.W.2d 712, and Gruetzmacher v. Hainey, Mo.Sup., 373 S.W.2d 45. Here, Clayton and John were in Charleston together on the day of the sale, clearing a deed of trust from the record. That the deed would be recorded then is reasonable and we would draw no unfavorable inference in such circumstances.

■ Also emphasized is Clayton's "obvious 'padding' * * * of documentary stamps" on the deed to John. The deed from the Schuerenbergs to Clayton bore documentary stamps in the amount of $11.-00, the tax payable on a consideration of $10,000. Clayton said that he paid only $7300 for the land. There was no testimony as to who computed the tax on that transfer. On the deed to John, the documentary stamps totalled $20.90, indicating a sale price of $19,000. There was no evidence as to who determined the amount of tax which should be paid on that transaction. No inquiry on the subject was made in the examination of Clayton, either direct or cross. We are unable to draw an unfavorable inference against Clayton.

On Clayton's knowledge of the pendency of the competency proceedings before the deed to John was recorded, another factor

relied upon by plaintiff's representatives, the testimony was conflicting. Mr. Clifton Banta, who represented the informant in those proceedings, testified that around October 11, 1960, Loren Storm and Dewey Heath came to his office and told him about the deal between John and Clayton. Loren said he didn't think the transfer should be made and asked Banta what could be done about it. Banta testified that he called Clayton and told him that "we didn't think [John] was of sound mind, [and] that his uncle was getting ready * * * to have him declared of unsound mind." According to Banta, Clayton said that the transaction "had gone too far and that he'd have to see his lawyer." There were no further dealings with Clayton or his lawyer. Clayton recalled Banta's call, but said that Banta merely told him "that somebody didn't want him to trade the land, and I said 'I'll see my attorney about that.'"

■ Accepting Mr. Banta's version of the conversation, there is no question that it occurred subsequent to the execution of the deed by John and its having been placed on record. There was no evidence of any effort to avoid the placing of the deed to John on record and no evidence of any offer to restore the status quo and rescind the transaction. We would not attach any particular significance to Clayton's knowledge obtained at that time and in such circumstances.

■ An unfavorable inference would also be drawn from Clayton's conveyance of the Scott County land to John before he had title to it. The deed from Clayton to John is dated October 6 and the deed from the Schuerenbergs to Clayton October 7. However, the evidence was that Clayton's contract with the Schuerenbergs was prior to October 7. The exact date was not shown, but there is no reason to infer that, as of the date of the deal with John, Clayton was in no position to carry out his part of the bargain.

Plaintiff's representatives also would infer doubt on the part of Clayton about the transaction from the fact that the balance due John was not paid until after title insurance had been obtained on John's 80-acre tract. Clayton's explanation for the delay was waiting for his lawyer to approve the abstract and John had not requested that the transaction be closed. According to Clayton, John had "made a trip somewhere." Clayton said that he did get title insurance on the 80-acre tract, but there is no reason to assume that the closing was delayed until such insurance had been obtained.

Reference is made to the Marshes' interest in purchasing the land and Marsh's allegedly false testimony as to his knowledge of the incompetency proceedings. Plaintiff's witnesses testified that Marsh exhibited an interest in acquiring the land before the deal with Clayton. Marsh denied having spoken to plaintiff's witnesses about the possibility of acquiring the land. Clayton said that when he purchased the property, he had no idea that Marsh was interested in it. When Marsh exhibited an interest, Clayton called Tyler in Illinois to find out whether Tyler had made any commitment to sell to the persons farming the land. John said that Marsh had not said anything to him about buying the land, although Marsh had agreed to lend him $1100 on the security of a deed of trust on the land. The deed of trust was actually executed and placed on record but no money had been advanced to John. When John and Clayton went to Charleston on October 6 to record the deed, the deed of trust, by arrangement with Marsh, was released.

Plaintiff's guardians also assert that Marsh's testimony that he was unaware of the competency proceedings at the time he bought the land from Clayton was false. Banta testified that on three or four occasions Marsh came to his office and they discussed the sanity proceedings and Marsh said that he was interested in buying the farm. Banta told him that it would be dangerous to do so, but Marsh said that if "they" got title insurance he would be protected. On the last visit, Banta said that Marsh told him that he was going to get title insurance and go ahead and buy the farm.

Marsh testified that he had talked to no one about buying the farm until the day before his deal with Clayton on December 14. He said that he was in Banta's office only once and that he did not discuss the purchase of the property.

Again, this is a matter on which there was a direct conflict in the testimony. Accepting Mr. Banta's version, it would show at the most that Marsh was in fact aware of the sanity proceedings. However, total disbelief of Marsh's testimony will not produce affirmative evidence of the essential lacking element of plaintiff's cause of action, John's lack of mental capacity on October 6, 1960.

Our de novo review leads us to conclude that the alleged lack of capacity on the part of John to execute the deed on October 6, 1960 was not proved.

The judgment is affirmed.

HOUSER and HIGGINS, CC., concur.

PER CURIAM:

The foregoing opinion by WELBORN, C., is adopted as the opinion of the Court.

HENLEY, P. J., SEILER and HOLMAN, JJ., concur.

STORCKMAN, J., not sitting when cause was submitted.