**In re Wallace K. HOLLANDER, Debtor.**

**Jack E. BROWN, Trustee, Plaintiff,**

**v.**

**Lisa Ann BLACK, et al., Defendants.**

**Bankruptcy No. 81–03263–C–11.**
**Adv. No. 81–2199–C.**

United States Bankruptcy Court,
W.D. Missouri, C.D.

Dec. 21, 1982.

Donald E. Bucher, Kansas City, Kan., Donald L. Crow, Kansas City, Mo., for de-fendants Lisa Ann Black, Patricia Jane Black and James Black.

Larry Wood, Columbia, Mo., for trustee.

Fred Dannov, Columbia, Mo., for debtor.

Jack E. Brown, trustee.

## MEMORANDUM OPINION AND ORDER

FRANK P. BARKER, Chief Judge.

This matter is before the Court pursuant to an action brought by the Trustee to set aside two transactions between the debtor and the defendants as fraudulent conveyances under 11 U.S.C. § 548. One transaction was a transfer of some 450 acres of farm land; the other an "assignment" of farm machinery. Trial was held before me on September 23 and 24, 1982, all parties being represented in person and by counsel. Based on the evidence presented the Court makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

The debtor, Wallace K. Hollander, is a farmer approximately 60 years of age. In 1979 the debtor and his wife, Ruth, were divorced. As a part of the property settlement pursuant to that divorce, Mrs. Hollander received 120 acres of farm land and a note while the debtor retained ownership of 450 acres of farm land adjacent to the land awarded to his ex-wife and substantial farm machinery. It is the transfer of this 450 acres and the farm machinery by the debtor to the defendants which the Trustee seeks to set aside.

In the two-year period following his divorce the debtor encountered a number of legal difficulties. On October 7, 1979 a criminal charge of stealing was filed against the debtor by Audrain County Prosecuting Attorney, Tom Osborne. The charge was based on allegations that the debtor had harvested, at night, a bean crop which was located on the land his ex-wife was awarded in the divorce. That crop had been planted and maintained by a tenant farmer who rented the land from the former Mrs. Hollander. Debtor was arrested

and placed in the Audrain County jail. He made bond and the charge was ultimately disposed of in some manner not entirely clear from the record. Mr. Osborne testified at the trial (TR. p. 91) that he had doubts about debtor's mental capacity at this time and suggested the possibility of a mental examination to the debtor's attorney. This suggestion went unheeded.

Debtor's next encounter with the law occurred in 1980 and ultimately resulted in the first contact between debtor and defendant, James Black. In April of 1980 Mr. Osborne again filed criminal charges against the debtor. On this occasion the charge was defrauding a secured creditor. The charge was based on allegations that the debtor sold cattle in which the Bank of Gerald had a security interest and had kept the proceeds. The Bank of Gerald (now known as the Missouri State Bank of Franklin County) held a security interest in debtor's property to the extent of some $20,000. As a result of this charge the debtor was once again arrested and placed in the Audrain County jail.

Defendant James Black worked, at this time, as a bondsman/agent for Surety Insurance Corporation of California (S.I.C.). There was some disagreement in the testimony as to how and by whom Mr. Black was contacted concerning the possibility of arranging bond for the debtor. No matter what originally brought about the contact between the parties, Mr. Black and the debtor ultimately met in the Audrain County jail and arrived at an agreement whereby S.I.C. would post a $5,000 bond to secure the debtor's release from jail and would, in turn, receive a $500 premium on that bond which was paid. The debtor also gave S.I.C. an assignment of his interest in certain farm machinery at a face value of $50,000. Defendant Black testified at trial that the actual agreement was intended to be for $5,000 and that the $50,000 figure was a mistake (TR. p. 255).

Debtor was released on bond and scheduled to appear for trial sometime in the Spring of 1981. He did not appear. In addition to causing his bond to be forfeited, this action caused an additional criminal charge based on bond-jumping to be filed against him. Black testified that although S.I.C. actually paid the $5,000 bond that under the terms of his contract with S.I.C., he became obligated to indemnify the company for its loss. No evidence was offered to confirm or deny this assertion on the part of Mr. Black.

It is not clear from the evidence where debtor was during the time in between his non-appearance on the defrauding charge and his ultimate appearance at the Audrain County courthouse. Apparently he was in Illinois at least part of the time. He also apparently maintained sporadic telephone contact with Mr. Black although there was no general agreement as to how often such contacts occurred. Mr. Black testified that these phone calls were generally about the possibility of the debtor giving himself up and returning to Audrain County to face the charges against him. They also discussed the possibility of the debtor obtaining bail through the services of the defendant upon his return to Audrain County if Hollander would deed over his farm. Although Mr. Black testified that these conversations were very erratic (TR. p. 229) he stated that at no time did he entertain any suspicions concerning the debtor's mental well-being.

The debtor reappeared in Audrain County on or about June 30, 1981, was arrested and, once again, placed in the county jail. The testimony is not clear as to whether he returned voluntarily or was transported to Audrain County by Illinois authorities but however he returned, an attempt was made to arraign him on the bond-jumping charge on June 30 and again on July 1, 1981. On both occasions the debtor would not stop talking long enough to allow the court to arraign him as is required under Missouri law. (TR. p. 95).

Mr. Osborne testified that he had previously filed a motion for mental examination of the debtor at the time the debtor first failed to appear on the defrauding a secured creditor charge. Debtor had been ordered to appear for such an examination

but had never appeared so that on July 1, 1981 the motion was still outstanding (TR. p. 97). On July 1, 1981 Associate Circuit Judge Heims entered an order to have Mr. Hollander sent to the State Mental Hospital at Fulton for a mental examination to determine his mental competence to face the criminal charges filed against him.

On July 1, 1981 James Black, either acting on his own or at the request of the debtor or the debtor's sister, attempted to see the debtor in the Audrain jail. On his first attempt he was denied the right to see the debtor by Sheriff James Barber. Sheriff Barber testified at trial that his refusal to allow Mr. Black to see the debtor was based on the outstanding court order requiring debtor to undergo a mental examination. The sheriff further testified that he informed defendant Black the reason for his refusal. (TR. p. 116) Mr. Black testified that he had not heard the sheriff give a reason for his initial denial of access to the debtor. (TR. p. 230).

James Black was then working as an agent for C & M Bail Bonds, Inc. Defendant Cody Ice was the president and sole shareholder of that company. Ice testified that Black called him in Macon, Missouri probably on July 1, 1981 and told him that Hollander was in jail and would deed over his 450 acre farm and farm machinery if they would put up his bond, arrange for an attorney and pay off the farm debts ... that they could make some money as the debts were around $250,000 whereas the farm was worth $500,000.

In furtherance of this plan, Ice called attorney N.E. Brown in Huntsville and arranged with him to meet with Ice and Black at the jail. He told Brown to bring along some deed forms.

As was stated earlier, the defendants were rebuffed in their initial attempt to see the debtor. They then visited Judge Heims and were able to obtain a court order allowing them to see the debtor. That meeting took place in an empty Audrain County courtroom. The evidence presented indicates that only the debtor and Mr. and Mrs. Black were present throughout the entire meeting, although Mr. Brown and Mr. Ice were able to observe the participants and entered the room periodically. Mr. Brown testified and this Court finds that he questioned the debtor about his financial condition and advised him as to the availability of other types of bond arrangements than through the use of the services of a bailbondman. As a result of the meeting in the courtroom the parties arrived at an agreement whereby C & M Bail Bonds would provide debtor's bond of $10,000 with no premium, pay off all of the debtor's outstanding debts and provide him with an attorney to assist in his defense to the criminal charges. In exchange the debtor was to deed the defendants his interest in the 450 acre farm and reinstate his assignment of his farm machinery. Apparently the basic agreement was orally arrived at while the parties were at the courthouse. The testimony indicated the parties believed debtor to have outstanding debts totaling somewhat in excess of $200,000–$250,000. Mr. Ice testified that he relied on Mr. Black's estimate that the farm land was worth approximately $500,000. (TR. p. 84). Although the estimate as to the amount of debt owed was essentially accurate, testimony at trial indicates that the value placed on the farm land was low.

After reaching an oral agreement at the courthouse, the defendants secured debtor's release on bond. The bond itself contained a special condition pertaining to debtor's continuing obligation under court order to appear at Fulton for a mental examination. Defendants Black and Ice testified they were unaware of this special condition on July 2 despite the fact that it was printed on the bond instrument. Attorney Brown denied seeing the bond.

One point all parties agreed on was that they left the Audrain County courthouse and traveled to the home of James and Patricia Black in Montgomery City, Missouri after securing the debtor's release on July 2, 1981. The purpose of this trip was to finalize the earlier oral agreement. This was accomplished by means of two quit claim deeds from the debtor of one-half

interest to Patricia and Lisa Black (daughter of James and Patricia Black) and to C & M Bail Bonds, Inc. The deeds were prepared in the debtor's presence by N.E. Brown at the Black home in Montgomery City. An agreement assigning all of the debtor's interest in certain farm machinery to Patricia and Lisa Black was also prepared. These instruments were properly notarized on the evening of July 2, 1981. The parties then went their separate ways with the debtor being driven to his sister's home by Cody Ice and N.E. Brown. The defendants testified that nothing in the debtor's manner throughout the entire episode caused them to have any concern about his mental condition. The debtor's conduct was generally described as somewhat elated at the prospect of completing the transaction and securing his release from jail.

Subsequent to July 2, the defendants engaged in several transactions. C & M Bail Bonds transferred its interest in the property to Missouri Enterprises, Inc., another company owned and operated by Cody Ice. Missouri Enterprises and Mdmes. Black then leased the farm property to James Black and his brother George Black for a 15-year period at an annual rent of $500 per year. Defendants testified they arranged a loan from Bell Investment Company presumably in order to pay off the debts against the property. The note owed to First Missouri Bank of Franklin County was paid by defendants. Arrangements were made with Ruth Hollander to prevent her from following through on an execution sale which had been scheduled for the following week on the farm property. Defendants also notified Prudential, which held a first lien against the property, to contact them as to all future payments.

Mr. Black entered into possession of the farm land and with the aid of a resident farm manager cleared some of the land and planted crops. Certain pieces of farm machinery were repaired, sold or traded by Mr. Black. Mr. Black never notified the debtor nor made any demand on the debtor prior to entering the transactions involving the farm machinery.

Debtor was also quite busy in the time after his release from custody on July 2nd. Pursuant to Judge Heim's Order he was committed to the Fulton State Hospital where he underwent a psychiatric evaluation over a period of several weeks. Although the entire staff participated in the diagnosis of the debtor, a Dr. C.J. Corales was primarily responsible for his care. Dr. Corales appeared at the trial and testified that Mr. Hollander had been diagnosed as a manic depressive, bi-polar mixed type (TR. p. 192). She further testified that this condition caused him to undergo wide mood swings between exuberant, almost giddy stages, to stages of deep depression. She testified that such mood changes could interfere with the debtor's judgment and cause him to make irrational decisions based on his own view of a situation. Finally, Dr. Corales testified that she was unable to say how the debtor's condition might have affected his actions on July 2, 1981 without observing him on that date. On cross examination, Dr. Corales testified that the debtor might often be in such a state that his mental condition might not be readily apparent to lay persons. (TR. p. 203)

As a result of the findings of Dr. Corales, the debtor successfully pled not guilty to the criminal charges facing him in Audrain County. He continued to undergo treatment at the Fulton State Hospital.

Debtor filed his voluntary petition in bankruptcy on October 21, 1981. Prior to that time he had filed a suit in the state court seeking to obtain the return of the property he had transferred to the defendants.

The testimony at trial established that the debtor's existing debts at the time of the transactions at issue here totaled no more than $250,000. The Trustee presented convincing evidence that as of July 2, 1981 the farm property was appraised at $562,500, but more importantly that an existing sales contract with a reputable buyer, Raymond Benne, for $675,000 was open for the debtor's consideration on July 2nd. This evidence established that defendants re-

ceived the farm land for from $275,000 to $450,000 less than its reasonably established value as of the date of the transactions between the parties. This figure does not include any value for the assignment of the farm machinery. This equipment included, among other items, two (2) combines, at least two (2) tractors and several plows of various sizes. While the condition of some of the equipment was disputed by the parties, it is apparent that it retained at least some value for which the defendants gave the debtor no additional consideration.

### CONCLUSIONS OF LAW

 Under Missouri law the party challenging the validity of a deed on grounds of mental incapacity bears the burden of showing by convincing evidence that the grantor lacks the mental capacity to understand the nature and effect of his act at the time of the execution of the deed. *Martin v. Norton,* 497 S.W.2d 164 (Mo.1973). Although the testimony of Dr. Corales and several of the other witnesses, including that of the debtor himself, supports the inference that debtor goes through periods where he is less than capable of handling his own affairs, the evidence presented does not establish that he was mentally incompetent on July 2, 1981.

The case of *Storm v. Marsh,* 418 S.W.2d 179 (Mo.1967) involves a fact situation somewhat similar to the present case in which the court allowed a deed to stand despite the testimony offered and the fact that the grantor was found to be legally incompetent both prior to and subsequent to the granting of the deed in question. Although this Court finds the testimony of defendants James Black and Cody Ice to the effect that they were unaware on July 2nd of any question concerning debtor's mental competence to be self-serving and totally lacking in credibility, particularly in light of Sheriff Barber's testimony and the existence of the special condition on the bond document itself, the Trustee still did not establish by convincing evidence that the debtor lacked the mental capacity to understand the nature and effect of his act on July 2, 1981.

The Trustee's claim to have the deeds set aside on the basis of an alleged violation of 11 U.S.C. § 548 are of a different nature and lead to a different legal conclusion than do the allegations involving mental incompetency. § 548 deals with fraudulent transfers and obligations and, in relevant part, states:

(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor—

(1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer occurred or such obligation was incurred, indebted; or

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(i) was insolvent on the date that such transfer or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

The Blacks, by way of post-trial brief and oral argument, take issue with the Trustee's claims as they relate to § 548(a)(1). They claim to have been, at all times since the contested transfer, ready, willing and able to satisfy the claims of the creditors of the debtor's bankruptcy estate. Toward this end they point out the purchase of the debt owed to First Missouri Bank of Franklin County, the agreement with and an interest payment to Ruth Hollander, the notification to Prudential that they would be responsible for future payments and finally, a loan commitment obtained from Bell Investment Company for $250,000, the proceeds of which were presumably to be used to satisfy the claims against the farm as well as the remaining claim owed to S.I.C. The Blacks espoused an intent to satisfy all of the debtor's creditors but claim to have been prevented from doing so by the Trustee's action in pursuing these claims.

■ Defendants' actions to pay debtor's creditors involved exclusively those creditors with an interest in the farm property. This Court takes judicial notice of the fact that the Hollander bankruptcy estate includes several substantial claims by creditors with no interest in the farm other than in its status as an asset, in fact, the only real asset, of the estate. Despite the fact that the defendants now claim to have agreed to repay all of the debtor's creditors, the fact remains that only those debts concerning the farm property were acted upon between July 2, 1981 and October 21, 1981 when the petition was filed.

It is also worth noting the amount of loan funding that the defendants secured approximately equals the debts against the farm property with apparently no provision for the other existing debts. To the extent that the farm land and machinery represent value which could have been used to pay *all* of the debtor's creditors whether through a reorganization under Chapter 11 or a liquidation under Chapter 7, an argument could seemingly be made that there was an intent to defraud at least some of the debtor's creditors. This could cause the transaction to be set aside under § 548(a)(1); however, in light of the applicability of § 548(a)(2)(A), it is not necessary for this Court to decide the validity of that argument at this time.

Under § 548(a)(2)(A) the adequacy of the consideration given for the transfer of a debtor's asset(s) is basically a factual issue to be decided by considering the circumstances of each case. See *Biggs v. U.S. Nat. Bank of Omaha,* 11 B.R. 524 (D.Ct. Neb.1981). A general standard has been applied by the courts under which transactions which do not produce at least 70% of the property's fair market value are set aside as providing less than the required adequate consideration. See generally, *In re Thompson,* 18 B.R. 67 (Bkrtcy.Tenn. 1982).

In the present case the plaintiff established that at the time of the transactions between the debtor and the defendants, an outstanding land sale to purchase the debt-or's property for a total price of $675,000 existed. This offer was made by Raymond Benne, a competent buyer and a farmer with years of practical experience in evaluating the worth of farm property. The plaintiff also offered the testimony of Fred Decker, an experienced real estate appraiser whose primary expertise was in farm property. His testimony was that the debtor's farm land was worth in the neighborhood of $562,500 on July 2, 1981. He further testified that he arrived at this figure by using the comparable sales method of appraisal. This is an accepted method of real estate appraisal. Defendant Cody Ice testified that James Black told him the property was worth at least $500,000.

■ Faced with this substantial evidence of the value of the debtor's farm land as of the date of the transactions with defendants, this Court has no difficulty finding the value of the farm land at least $562,500 and probably $675,000 on July 2, 1981. This figure does not include any value for the farm machinery the defendants also obtained control of as a result of the transactions contested herein. At either the greater or lesser figure the debtor could have paid off his existing debts and been left with money or property. Instead, as a result of this transfer, he is insolvent.

In exchange for this valuable farm land and the machinery the defendants agreed to assume a first lien in favor of Prudential Insurance Company in the approximate amount of $47,000, to assume the debt to Ruth Hollander of approximately $130,000 and to pay off the debt of some $19,000 to First Missouri Bank of Franklin County. These debts total approximately $196,000. Adding in the $5,000 owed to S.I.C., attorney fees for the debtor's criminal defense which were very liberally estimated by Attorney Brown to run as high as $10,000 and the $10,000 bond to release the debtor from jail, still only brings the expenses of the defendants to somewhere in the neighborhood of $220,000 to $225,000 figures which are far below the 70% of fair market value standard applicable in assessing adequate consideration.

Defendants ask that the Court ascribe some value to the fact that the transactions with the defendants enabled the debtor to obtain his release from jail. While this could indeed have great value in certain situations, in the present case the actions of the defendants only further serve to show their willingness to take great advantage of a man in a less than rational state. Debtor could have easily provided for his own release by merely granting a security interest in his farm or in his machinery but instead of seeking security, the defendants sought to, in effect, purchase the farm land for considerably less than half of its fair market value.

It is true, as defendants suggest, that an execution sale was scheduled on debtor's farm land as a result of the debt owed to his ex-wife a few days after July 2nd. However, the testimony at trial indicates that the former Mrs. Hollander had cancelled two such previously scheduled sales prior to their completion. Mrs. Hollander indicated her willingness to have done so again on this occasion. Throughout her testimony Mrs. Hollander exhibited great sympathy toward her ex-husband and her desire to help him despite his less than considerate attitude toward her. She also indicated that she had offered to buy the farm from the debtor on several occasions. Although in debtor's mental state he may not have been able to fully realize their existence, he had several options available which would have allowed him to save the farm from the scheduled execution sale.

Because the farm land and the machinery were the only real assets of the debtor's estate, there can be no doubt that their sale in exchange for the repayment of some of his debts rendered the debtor insolvent as defined in 11 U.S.C. § 101(26)(A) thus satisfying § 548(a)(2)(B).

This case presents a somewhat unique application of § 548(a)(2)(A). In the usual case applying that section, the debtor, in collusion with the transferee, transfers some property to place it beyond the grasp of his creditors before he files his bankruptcy petition. See *In re Roco Corp.*, 15 B.R. 813 (Bkrtcy.R.I.1981) and *Matter of Commercial Candy*, 20 B.R. 292 (Bkrtcy.Mo. 1982). The transferee gets the assets for less than its value to the detriment of all other creditors of the estate. In the present case, the debtor's confused state of mind makes it virtually impossible to assess his motivation in entering into this transaction. Whatever the debtor's motivation, the transfer of the farm land and of the machinery were for less than adequate consideration as defined by the courts and rendered the debtor insolvent. The transactions thus violate 11 U.S.C. § 548(a)(2)(A) and (B) and are void and without effect.

Defendants have suggested in their Trial Brief that the 70% test applied in *Thompson, supra* and other cases interpreting § 548(a)(2)(A) should not be applied in this case. As an alternative they propose a test adopted in *In re Browning Tufters, Inc.*, 3 B.R. 487 (Bkrtcy.N.D.Ga.1980). That case was decided under § 67(d)(2)(a-c) of the old Bankruptcy Act and was obviously decided well before the present 70% rule of thumb standard. In any event the court in *Browning Tufters* did not have any evidence of the actual value of the collateral before it when the decision in that case was reached. Further the court still held that fair consideration was necessary to support a transfer of property. The standard that has evolved as to what constitutes fair consideration is 70% of the fair market value of the property transferred. The decision in *Browning Tufters* does not seem to be in conflict with that standard and does not provide the defendants any additional support in this case.

I further find that defendant Black's testimony regarding Hollander's eagerness to deed over his farm and machinery not worthy of belief. On at least ten (10) different occasions there was a contradiction between his testimony in court and his written deposition. Sheriff Barber testified that he told Black he couldn't see Hollander on July 2, 1981 because there was a court order to take him to Fulton for a mental exam. Black denied such a conversation on direct examination but on cross examination by his attorney stated that if the sheriff said that he didn't hear him.

Black's testimony regarding the $50,000 note wherein at one point he stated that should have been $5,000 was not convincing just by his demeanor while testifying.

When questioned about the deeds being made out to his wife and daughter he said it was for tax reasons which he did not explain. The Trustee then obtained admissions from Black that there were outstanding judgment liens against Black which could be transcripted to Audrain County.

I find and conclude from all the evidence that somehow Black convinced Hollander to deed over his only assets if he wanted to get out of jail on bond.

The Court also notes that during the trial defendant Ice testified that he would have no objection "to our deed being set aside" and letting our expenses become a claim. (TR. p. 56).

As to the defendants' claims for a lien against the estate to the extent of their expenses in these transactions, that will depend upon their ability to establish proper proof of those expenses and to establish their position as a good faith transferee of a voidable transfer. Since this matter was not heard on September 23 and 24th, the defendants will be given the opportunity to establish their claims at a later date upon due notice.

Based upon the foregoing findings of fact and conclusions of law, it is

ORDERED, that the deeds from Wallace K. Hollander to Lisa Ann Black and Patricia Jane Black and from Wallace K. Hollander to C & M Bail Bonds, Inc. dated July 2, 1981 and the deed from C & M Bail Bonds, Inc. to Missouri Enterprises, Inc. dated July 16, 1981 are hereby declared to be null and void. It is

FURTHER ORDERED, that defendants forthwith turn over possession of the 450 acre farm to the Trustee as well as all farm machinery now located on the farm. It is

FURTHER ORDERED, that defendants are hereby restrained and enjoined from doing any act to interfere with the Trustee's possession of the farm and machinery. It is

FURTHER ORDERED, that any lease of the farm made by defendants or any of them is hereby declared null and void. It is

FURTHER ORDERED that defendants may have thirty (30) days from the date of this Order to file a proof of claim against the Hollander estate. It is

FURTHER ORDERED, that Ruth Hollander may have thirty (30) days from the date of this Order to file her proof of claim against the Hollander estate. It is

FURTHER ORDERED, that the $50,000 note secured by farm machinery of Hollander is hereby declared null and void.